The next case for argument is Amalgamated Bank v. Facebook. Judge Bumate, may it please the Court. My name is Tom Goldstein and I represent the appellants. In 2023, it's commonplace to understand that big technology companies have an enormous amount of individuals' private information, and that if they wrongfully disclose that or engage in activity that causes a big breach of privacy, that the users are going to react very poorly and the market will react very poorly. And that commonplace understanding today is rooted in the scandal that's at issue in this case, the Cambridge Analytica scandal and its collateral privacy violations by Facebook that produced more than a $100 billion stock price drop, more than $5 billion in fines paid by Facebook. I want to start, if we can, with the risk statements. There are three categories of statements. I'm going to start with the risk statements. And we know that there was a legal error by the district court. The district court principally dismissed this claim on the ground that the harm that was identified in the risk statements had not occurred, had not obtained, had not turned into reality at the time the statements were made. And this court's intervening decision in the Alphabet case makes clear that that's wrong. So what we have is Facebook arguing, as it can, that the judgment should be affirmed on an alternative ground, one that was suggested by the district court, and that is essentially a truth-on-the-market defense, that everybody already knew that this had happened, and therefore it wasn't false. Now, there's a legal error in the district court's decision there, indisputably as well, and that is the district court didn't apply the legal standard for the truth-on-the-market defense. This court's decisions and the decisions of other courts of appeals are, quite rightly, quite rigorous on this defense. It's not a question of the plaintiff's pleadings. It is a question of there being a, quote-unquote, very high bar for the defendants to show, essentially, that both the breadth and the depth of the disclosure to the market was such that there was nothing that nobody would believe, essentially, the false statement. So you're talking about the Provence case and others that lay out this standard. So the question I have is I think there are articles from The Guardian and The Washington Post, and what statements there in which there is disclosure and discussion about this do you think are too vague or too ambiguous to not meet the standard? Because definitely it's in the news, but may it be it's not of the news. Right, and that's, I think, the question of the breadth and the depth. Here are the differences, we think, and it's the reason the market didn't really react at the time in 2015 to those articles. The first is it's not at all clear that this occurred from those articles without the user's consent. There are contemporaneous denials, and that makes this case quite similar to the Goldman Sachs case from the Second Circuit. So what happens is that the individual who's involved, Kogan, and also the Cruz campaign, which is what was involved, say that this occurred with the user's consent. The second thing is that there's a big dispute about the scope of it. They were talking about a few thousand people, whereas the article suggests that it could be tens of millions of people. It turns out the latter was true. I think just as important is that Facebook really, really downplays it at the time and in the succeeding years. Facebook doesn't say, yes, this occurred. Facebook says, we're going to investigate, and if we find that they've done something wrong, well, then we're going to take aggressive action. And then by all accounts, from what the public knows going forward, Facebook does nothing whatsoever. There's no public banning of Kogan. There's no statement by Facebook at the time, yes, we discovered this was true, until the corrective disclosure in March of 2018. Do you distinguish between the statements that talk about harm to the business itself and the ones that potentially talk about the user's data? Yes, Alphabet does that, and what Alphabet says is when you talk about a risk, there was the risk of kind of hacking here. We say the risk was about the disclosure of user information through a third-party vendor. When you talk about that risk, and then the statement also says, well, if that risk actually obtained, it would harm our business. The defendant can't hide behind that it would harm our business, because the only reason it hasn't harmed the business is nobody knows the truth. And so what the court in Alphabet in its recent decision quite rightly did is focused on the risk that is involved that would give rise to the harm of the company. And here we say— But just to go back, there wasn't that privacy bug, and the problem in Alphabet was completely unknown. Well, Your Honor, I think that is correct, and that's the defendant's argument, and that is Alphabet would not apply where you have the truth on the market defense. Alphabet makes quite clear that while that's a fact in the case, that's not the basis for the decision. The basis of the court's decision is that the risk, you're describing something that's a risk when it's actually true, and you know that it's true. That's where the fraud on the market occurs. The fact that you say that it could harm the company is kind of obvious. We know that this is something that could cause injury to the company, and the fraud doesn't relate to your lying about whether the company could be hurt. What you're doing is you are misleading the market about whether this has already happened, as it had with Cambridge Analytica and the Cruz campaign. So you're talking about the 10-K statements, correct? So weren't they all in the context that they could, quote, harm our reputation and adversely affect our business? At that point, all we knew was the Cambridge Analytica disclosure, and that did not harm its reputation or adversely affect our business at that point. So how is that false at that point? The whole point is that the marketplace didn't know the truth. You're quite right that when it's disclosed in 2015, it doesn't tank the stock. It doesn't do anything in particular. When the truth comes out in 2018, the stock first goes down 18 percent and then goes down 19 percent, more than 100, the single biggest drop in stock value in the history of stock. And so the reason that it does not occur at the beginning, we say, is that the truth doesn't truly come out in the market. That's why this standard is so rigorous. That's why it's a fact-based thing. That's why the court has said that it's not really susceptible of dismissing a case. But I thought the standard is that if it's false, if the risk is already happening, then you can't say it. But here the risk did not happen at that point. Well, what Alphabet does is it distinguishes two different kinds of risks, and it says the relevant risk is the threshold, the antecedent one, what's going wrong in the company, not that the company will be harmed. Here what had happened is that the information had been disclosed to the third parties through Cambridge Analytica and to the Cruz campaign. Facebook knew that at that time, we allege. And we have statements by Mr. Zuckerberg and Ms. Sandberg from later on in interviews saying that back at the time they knew. There's a fight about this. They cite the SEC complaint that was negotiated, but that's just a factual fight between the parties. We have a well-pleaded allegation that the defendants who were involved in formulating the 10-K knew that this had already happened, that the information had already gone over to the Cruz campaign, and the market didn't know that. Now, again, there's a factual fight about that. The legal standard on determining who's right in that fight is what the district court didn't apply. What the court's precedents say prevents cases like that is that if the defendants want to prove that, look, nobody would believe this lie because everybody knew the truth, that's a hard argument to make. The other point I would say is that there's another good piece of evidence that this court has looked to, and that is, okay, when the corrective disclosure occurred, compare the market reaction to that, to what the supposed truth on the market was. So if you compare what happened in March and then in July of 2018 to what happened in late 2015, they don't bear any relationship to each other in terms of scale. It's much, much, much greater reaction later. Now, the other side has an argument about that. They say that the corrective disclosure in March of 2018 was a much bigger one. It was that the information Facebook fessed up, not only that the information had gone over to the Cruz campaign, but also to the Trump campaign and to the Brexit campaign. And they say, well, that's why there was this big market reaction. Okay, this is, again, a dispute. There will be event studies about that in the case. But what we are trying to prove is lost causation, which is proximate cause. I'm not trying to prove to you that we have pleaded that the entire stock decline in March of 2018 or the entire stock decline in July of 2018 is attributable to this misstatement from back in 2015. I'm trying to prove to you that we have pleaded that some of it is. And when the SEC's complaint against Facebook refers back to the original disclosure to the Cruz campaign, when the New York Times is saying at the time that the full scale of this just wasn't even known back at the time, then what we have done is we have pleaded that some of this, at the very least, is attributable to what it said about the risk statements in 2015. So that's the first category. And I think that we have the conceded legal error about Alphabet. And then we have the fact that the correct legal standard for proving truth on the market as a defense was not applied. Now, we have two different categories of statements. And with the Court's permission, we can move on to those. Those are the investigation statements and the user control statements. I'd like to focus on this legal question about what you do when there is a disclosure in June of 2018 and a market reaction in July of 2018. I'm most interested in that question, too. Exactly. And where does Gilead fall in this? Where do the Court's precedents tell us about that? So just to set the table about this, what we have is a disclosure about the white listing practices of Facebook in June of 2018. And the other side says, well, this cannot have been a thing. The market didn't do anything. And so what's our explanation for the fact that the market doesn't do anything? And then we point to loss causation either earlier in March of 2018, or I think our stronger argument is later in July. And what cases like Gilead say is they've got a point. The strongest evidence that you can have when you have price maintenance of the fact that there is a corrective disclosure and fraud is that the stock price will go down right away. That is a good piece of evidence for you. But it's not the be-all, end-all. Cases like First Solar and others, including Gilead, say there can be extenuating circumstances in particular cases. And if you can plead them, then you can move forward with your case. And so what we have in Gilead is what we think is a very similar situation. What Gilead had was an initial corrective disclosure where it was that there was this concern about how it is that they were marketing a drug. But the market didn't know what it would mean to Gilead when the government eventually said, you are not allowed to sell the drug in this way. And three months later, not nearly one month later, three months later, everything was disclosed in an earnings statement about, oh, gosh, this is going to be a really bad thing. So your argument is after the whitelisting article came out, then user engagement declined, ad revenue declined? Well, not just that. It did, but also much more importantly is that the marketplace knew. When the whitelisting disclosures occur, Facebook says, you know, we don't think this is going to be a huge deal. We don't think this is going to be a big problem. The first quarter earnings statements had only a few weeks from after the March disclosure, which is when they preempt the articles in Guardian and the New York Times. The second quarter earnings statement come out, and it is a huge problem. It turns out that users are very upset about this and that advertisers are reacting as well. Earnings are down significantly. Now, again, they have a factual argument about this. They say, no, no, no, it's the GDPR in Europe. It's the fact that it's flat in the United States. This is the kind of class— That's a co-mingled factual issue, correct? Yeah, that's how we have—we have event studies about this. We will debate this. There will be experts. I understand their argument. The question is not could they possibly win on this. Okay, I suppose they possibly could. It is whether we have pleaded that no. Counsel, question. So that article came out on June 3rd, 2018. When was the end of that quarter? When was the end of the quarter? Yeah, so that would be Q2, right? Yeah, it was usually around June 30th. Just right around that. Yes, exactly right. So basically for your argument to be true, within that, what, 27 days, user engagement, advertising revenue, all these things had to drop so precipitously to then warrant what was announced on July 25th. Yeah, I don't think we could say that everything that happened in July was attributable to whitelisting. I just don't think we could. I think that there's other stuff that's going on. We recognize that sort of thing. The question is whether some of it did. And I think what's going on here is a recognition of it being the type of thing that users really care about. Remember, nowadays, what I started with is like everybody gets now that these big tech companies have so much private information. It's a huge deal. People care enormously about their privacy. In 2015 to 2018, this was all very nascent. That's what makes this case like Gilead. You had a situation where the marketplace didn't really know what would happen. How would users react to the prospect of their information and their friends' information being given across? I think the marketplace probably would react differently now than it did then. But what we have to show to you is that the whitelisting disclosures, which were very significant, and that is, look, we told you before that this information won't go to third parties. And then they fess up and say, well, it turns out we had a bunch of companies, Microsoft and BlackBerry and everything, that we had secretly said, okay, no, you can still get this information. And that was the subject of a lot of marketplace commentary, analysts attributed part of their client to it and the like. That's what we will fight about on the facts. I see that I'm going deep into my rebuttal time. I don't want to unduly take that up if I could reserve the remainder of my time. Thank you. Thank you, Counsel. Good morning, Your Honors. May it please the Court. Joshua Lipschutz for Facebook. My colleague started with the risk factor statements, so let me start there as well. My colleague began by saying that the 2015 articles did not explain to the public, for example, that the data was exposed and given to Cambridge Analytica without user consent. Well, I have the Guardian article right here from December of 2015. The headline is that Ted Cruz is using a firm that harvested data on millions of unwitting Facebook users. The first sentence of the article says that Ted Cruz's presidential campaign is using data based on research spanning tens of millions of Facebook users harvested largely without their permission. That was the first sentence of the article. And the New York Times, in addition to the Washington Post, Your Honor, the New York Times published another article just later that same month, December of 2015, in which they said that the Guardian recently reported that Facebook data was being accessed, millions of users, without users' permission. By December of 2015, the public knew, and by the way, under the fraud on the market theory, the public is presumed, investors are presumed by law to know all information that is out in the public record. That is a core predicate for the presumption on the market theory. The public knew in December 2015 that millions of Facebook users' data had been obtained by Cambridge Analytica without users' permission. When the March 2018 article came out, in, by the way, the same publications, the Guardian and the New York Times, very same publications, reporting again in March of 2018 on the Cambridge Analytica incidents, those articles, if you read the New York Times article from March 2018, one of the paragraphs in that article starts by saying, in 2015, we reported, in 2015, and they all reference the articles that had already come out three years earlier, what was new about the 2018 article was that the public learned and Facebook learned at the same time that Cambridge Analytica had lied to Facebook when Cambridge Analytica certified that it had deleted all of the user data. Cambridge Analytica and Alexander Coggins sent certifications to Facebook saying that they had deleted the data, and you don't have to take my word for it, but the complaint itself, at paragraph 690 and many other places, says that the news regarding Cambridge Analytica's continued possession and misuse of the personal data of tens of millions of Facebook users that emerged over the March 16, 17, 2018 weekend partially revealed defendant's class period representation set forth above to be materially false and misleading. So under the plaintiff's own allegations, there was new information that came out into the market in March of 2018. The new information that came out was that Cambridge Analytica still had the data. That information was news not only to the public, it was news to Facebook. Let me tell you, everything you said may well be true, but when I go back and I look at these risk management statements, it's like Cambridge Analytica never existed. So they are so anodyne, like there could be, if our data were accessed or if they were hacking, there could be damage to us if this were to occur. But at the time, isn't there a factual question about what Facebook knew vis-à-vis Cambridge Analytica? And these are statements in 2017. Those are in the complaint. So that's where I'm having some collision because there's the 2017 statements and we've got the 2018 statements, and then we get to the sort of grandmother of them all when everything is put out there. So why isn't there enough in terms of the risk management statements to let it go forward? Because, Your Honor, the 2017 statements in the 10-K, first of all, I would respectfully disagree with the court's characterization of them as anodyne. They go into quite a bit of detail about the many different ways that users' data can be accessed and, as the district court held, how that could affect Facebook's business. But remember, under this court's case law, for example, the convergent decision, 948 fed 2nd to 513 and many other cases, an omission, and this is a quote from the case, an omission is only materially misleading if the information has not already entered the market. That's a direct quote from this court's decisions, and there's other decisions as well that say the same thing. The question when our... But the statements that Judge McEwen has asked you about are so general that they should just be boilerplate. They should be standard language for any corporation in America to issue. It says, gee, if bad things happen, bad things might occur to the company. And that's just not very helpful. Well, the risk for... I would respond in a couple of ways, Your Honor. The risk that the company identified, the risk that the plaintiffs point to as being arguably misleading, as an initial matter, if you look at the headline of that risk factor section, that risk factor is all about hacking and phishing attacks on our systems. The Cambridge Analytic incident was not a hacking attack. It was not a phishing attack. It was not a cyber attack of any kind. Alexander Kogan obtained the data with users' consent and sold it to Cambridge Analytica, again, violating Facebook's policies. So, as an initial matter, the very type of risk that is being disclosed by the company in terms of hacking and phishing and cyber attacks that the plaintiffs say was misleading doesn't even cover the type of events that were at issue here. But that feels like that might be worse for Facebook because now you haven't given them any warning at all. No, Your Honor, because that is the very risk that they are saying was misleading. That risk has nothing to do with the events at issue. But I would say, Your Honor, if that is the section that plaintiffs wish to point to as being misleading, which it is, that's the section they point to, that section itself says, in addition, those types of attacks, computer malware, viruses, social engineering, predominantly spear-phishing attacks, and general hacking have become more prevalent in our industry, have occurred on our systems in the past, and will occur on our systems in the future. So if that's the relevant risk disclosure, right there in the risk disclosure itself, the company explains that that kind of attack has occurred now. Counsel, that language is so boilerplate that Facebook would be foolish not to stick that statement in every reported issue. Well, the statement does appear as a risk factor in many of the company's statements, but if you think about what is omitted, what would the company have said? But it's true today. If Facebook is not putting that in their next financial disclosure statement, they ought to have their head examined. They ought to fire the general counsel. But virtually any company would, you could write this today for virtually any tech company. Sure. That holds user data. Because if they've had one incident of phishing by some, you know, 18-year-old sitting in his parents' basement, the statement is true, but it's not helpful when considering the nature of the leak to Cambridge. Okay, Your Honor, but remember, we are dealing here with securities fraud. This is a particularized, these have to be particularized allegations that meet a heightened pleading standard to show fraud. Fraud, that involves scienter, it involves reliance, and it involves loss causation. So even if Your Honor were to think that which I do not, and I hope Your Honors do not, but the district court certainly did, that the statements at issue were in some way materially false or misleading, the question then becomes, was there a fraud? Was there somebody at the company who was responsible for those statements that was trying to mislead the public? It's not plausible that the company was trying to mislead the public about something that the public already knew. The public knew in March of 2017. Isn't that the fact of why it's so boilerplate, is that you don't want to fall into this trap of saying something wrong? That's exactly right, Your Honor. These are the kinds of risk statements that companies put into their disclosure statements. They're often forward-looking. They talk about harms that could face the public. And, of course, under the securities laws, companies try to cover all manner of risk. But the question is, what was omitted, and was there some intentional attempt to deceive the public about something that the public already knew? Of course not. In this case, this Court's case law is clear that when it comes to scienter in a securities fraud claim, the fraud and reliance, by the way, the fraud on the market theory has to presume that the market is already aware of public information. You can't pick and choose. The plaintiffs don't get to say, well, the public was aware of the 2018 articles in The New York Times and The Guardian, which, by the way, included all kinds of denials by Cambridge Analytica and Alexander Kogan. The public knew and really cared about those articles, but they didn't know or care about the December 2015 articles that reported on the exact same thing. The plaintiffs don't get to have it both ways. They're asking the Court for a fraud on the market theory without accepting the fact that the market already knew the information. Can I shift your attention to the loss causation argument and the whitelisting article? Yes. Basically the Gilead theory. To me, I have to admit, it seems somewhat plausible that after the whitelisting article came out, user engagement dropped, advertising dropped, and so that kind of led to the loss in earnings that was announced in July that led to the stock drop. A couple of responses, Your Honor. First of all, with respect to the June – so remember, the article about whitelisting came out in early June. The earnings report was the end of July, so a month and a half, two months later. The plaintiffs themselves, in their briefing, in their complaint below and in their briefing before this Court, argue that in March of 2018 – they try to take advantage of the March 2018 stock price drop even with respect to the June whitelisting articles, right? And what they say in their complaint below, paragraph 703, as well as the argument in their briefs to this Court, is that in March of 2018, the public already had all the essential facts it needed about the June whitelisting disclosures. So they're trying to basically get the Court to say that the March 2018 stock price drop was the result of the June 2018 whitelisting disclosures. But I think there's an alternative theory of liabilities, that the whitelisting article led to a drop after the fact that was reflected in the June earnings – July earnings call. Certainly, there is an alternative argument. My point is simply, in the Court below, they focused on the July one, then they switched back to the March one, and now they seem to be switching back to the July one, which my colleague said is the stronger argument. With respect to the – I also think it's a stronger argument. Well, with respect to the July earnings disclosure, first of all, there is nothing whatsoever in the earnings release or earnings report about the company in July that has anything to do with whitelisting or any of the issues that were revealed to the market in June. What the earnings report in July was all about in terms of the increased expenses of the company was compliance with GDPR, foreign exchange rate impacts on the company, and other things that took place, other increased expenses that plaintiffs themselves allege in their complaint. So you don't have to go beyond the four corners of the complaint. The plaintiffs point to lots of other things that happened to the company, most importantly GDPR compliance that was taking place at that time that explains the general health of the company and the reason users – the reason expenses were way up. Expenses were up 50 percent that quarter. That has nothing to do with data privacy or whitelisting. But the question is, is it plausible that also the whitelisting article contributed to that decline in earnings? It's not, Your Honor, because one, the plaintiffs themselves argue that all of the facts about whitelisting were known to the market in March of 2018, but certainly no later than June of 2018. So in June 2018, all of the facts in the New York Times article were released to the public. The public can then evaluate for itself whether it thinks the whitelisting issue is a big enough deal to affect the stock price. By the way, it didn't. It decided that the stock price should remain exactly the same and in fact the stock price went up from there. So that is a very strong indication when those facts were revealed to the public and the stock price didn't move, in fact went up, that is the strongest indication that there's no loss causation between the revelation of the information. But what about under the Gilead theory? But Gilead – User engagement could drop, revenue could drop because of the whitelisting. Why is that not plausible? It's not plausible that the whitelisting allegation from mid-June, as Your Honor pointed out, could have such a big impact on the company's financial performance in that quarter to have the kind of earnings missed that the company had that quarter. It's not plausible. And I would go beyond that and say that the Gilead decision was something else. In the Gilead decision, what the court said was that the initial disclosure to the public, and this is a quote, did not contain enough information, end quote, at page 1058 of that decision. Did not contain enough information to reveal the underlying fraud or the underlying factual issues to the public. And so it took until the earnings release. The earnings release actually completed the picture and gave the information about the fraud. And therefore, they both went to revealing the facts about the fraud. That's not plaintiff's argument here. Plaintiff's argument is that the facts of the fraud, the existence of whitelisting, was known to the public as of the June – certainly no later than the June 2018 article. In fact, they say the March – by March, plaintiffs had all the facts they needed. What they are saying is that the public didn't understand the impact of the fraud on the company until the July earnings release came out. And that theory – I'm sorry to interrupt you. That theory was squarely rejected by this court in the Oracle decision. In Oracle, the court said that you cannot show loss causation by showing that the market reacted to the, quote, impact of the fraud rather than the fraud itself. And that's this court's holding in Oracle. And it makes perfect sense because the market has to decide for itself whether the facts alleging – the facts involved in the alleged fraud affect the stock price. The securities – the securities laws are not an insurance policy against losses that result from earnings misses. They are designed to protect investors against actual fraudulent statements, facts. And the facts were all known. All of that you've said, I think what you're saying is simply that any stock drop would have had to precede those June statements because that was where the disclosures had been made already. Certainly at the time that the facts were revealed to the public in the New York Times article in June, if there was going to be loss causation at that point, there needed to have been a stock price drop at that point in time or at least closely connected to that when here the obvious, most plausible explanation for the July stock price drop – now remember, this is heightened pleading under Rule 9b. The most obvious explanation for the stock price drop in July was the earnings release. And the earnings release was all about increased expenses, compliance with GDPR, and foreign exchange – But why isn't it plausible that that earnings loss was also attributed to the whitelisting? Because the earnings – whether or not the fraud ultimately impacted earnings – first of all, it's not plausible because it would have meant that the mid-June disclosures would have had to have some major impact on the operations of the company within June, which is not plausible. But even so – In 27 days. But when we keep saying plausible, I keep thinking factual, expert analysis. I mean, that's kind of what my ears are hearing. Well, not under Rule 9b. It has to be the most cogent and strong explanation for it. It has to be at least as strong as any other theory. And that is not the case here where there was an earnings disclosure. In fact, when the earnings announcement came out at the end of July, analysts on that earnings call said, Oh, this is exactly what you told us about last quarter. You warned us about the GDPR implementation and how it could affect the business. You warned us about increased expenses with respect to foreign exchange. That's what happened, and that is by far the most cogent explanation for a major earnings miss at the end of July that led to that stock price drop. Not a revelation about a practice that frankly was nowhere near of the magnitude. Can the discovery kind of prove that? If we look at the July – the June 3rd date with the white listing and if we – and then discovery shows that there's a huge drop in user engagement the next day, wouldn't that kind of prove loss causation also? No, Your Honor, because again, I – So should they get discovery to prove that? No, Your Honor, because first of all, Congress enacted the PSLRA and there's Rule 9b and we have to be very careful not to let securities claims go on speculative theories about what might have happened. There's stock price drops all the time in the market. We can't have a securities fraud claim every time there's a stock price drop. And second of all, Your Honor, that still doesn't solve the oracle problem, which is, if there's eventually an earnings miss that results from some earlier fraud that had already been revealed to the public, it's not enough under this Court's case law to say that the earnings miss caused the stock price drop because that's the eventual effects of the fraud when the fraud itself was known to the market earlier and the public had – and investors had the ability to evaluate those facts and decide what they mean vis-a-vis the stock price. It turns out that sometimes investors get things wrong, but that doesn't make it a fraud. Thank you, counsel. Thank you, Your Honor. Thank you, Your Honors. Briefly, I started the argument by saying that I think it's clear there are two legal errors, the alphabet error and the failure to apply the correct legal standard when it comes to truth on the market, and my friend didn't say anything to the contrary. The district court's decision is legally flawed for that reason. The question is whether the high standard for the truth on the market defense can be met here, and we acknowledge that the market did have some of the information. But when Facebook, in addition to the points that I mentioned earlier, directs reporters to Cambridge Analytica's denials, when Facebook says, we will take action if we find something wrong has happened here and takes no public action whatsoever, when admittedly the beginning of the article says, we think that this occurred, but then there are denials through the article. Cases like Goldman Sachs say you do not have the breadth and depth of the corrective disclosure that later the market became aware of. That only happened later. Yes, some of the information had already become public. Our point is that with the risk statements, when Cambridge Analytica was such a significant issue, when Facebook knew that fact, knew what had occurred, to have in the 10-K the statement that says, look, this could theoretically happen sometime and it would be bad for the company, is the kind of anodyne denial that's intended to give the marketplace, Alphabet says, the impression that, ah, there's nothing going on here. We know that there have been articles about this thing. If that risk did obtain, that would be a problem for the company, but as far as anyone reading the 10-K would see, that actually had not occurred. And so there was just not the full truth on the market of this very factual defense that this case, court's cases require. Then briefly, with respect to what happened in the June-July period, I think the false premise of my friend is that when I'm trying to say that we pleaded loss causation adequately, I have to have pleaded that the entire hundred million dollar stock drop is attributable to this. That is not what I'm trying to do. It is not what I am required to do. Yes, the GDPR mattered, absolutely. Yes, other things. It's a very big and complicated company, but what I am saying is that this privacy question was revealed to be extremely important to the users. What they had been told about whitelisting turned out not to be true, and it had an effect on the company that wasn't immediately known. It became... Why didn't we see something happen in June? I mean, the sequencing here is very suspicious. You have weeks here for the market to figure this out, and what you're telling us is that they couldn't figure it out in the following three to four weeks, then an earnings report comes out that is adverse, and then sometime after that, there's a drop, and it's only then after the earnings report comes in that it sort of dawns on them that they have a problem with... It is quite... It is essentially contemporaneous with the earnings drop, but you are right that in the June period, that's the intuitive question, and that is we would have a much more obvious case if in June of 2018 it had gone down immediately, and you ask, how did they not figure it out? Because all the information is in Facebook's hands. This is not the kind of thing... So was there additional information that came out after the June 3rd article? No, what happened is the earnings report revealed that there was much lower user engagement and there was much lower advertising than had been anticipated. That's what happened. There wasn't... Remember, this is at a period of time where we're just not... But now aren't you telling us that the earnings report is the cause of the stock drop? But the earnings report doesn't have to reveal the fraud. The earnings report has to reveal the effect on the company. I acknowledge that Facebook said, look, this is because of GDPR. Facebook said it was because of other issues, but that doesn't prevent the marketplace from realizing, no, no, no, no, no, no. What's happened here, in part, is that the users are very upset about this privacy issue as we know now really is going to be the case, right? That's not what the law requires. The corrective disclosure has to reveal the truth. What Gilead says is that it revealed the full effect on the company. It doesn't have to reveal that Facebook acknowledges that it was lying at the time. No, I think that what's troubling me is the Oracle case about whether you're looking at downstream effects and you're kind of going from March to June to July. And so, how does that time frame plus the white listing in June really overcome this Oracle construct? Sure. So, just to make the point that the March period is part of our narrative about what happened in the company, I should have said,  this in answer to your question, Judge Wybie, and that is that there were disclosures, significant disclosures, that the user controls the user and the user controls the user. And the Oracle statements by Facebook were not accurate. And so, the market already baked some of that in March. And that's why we think there isn't this dramatic reaction in June. I do agree that you have to find the line between Oracle and Gilead and that this case tests those two things. And if all that we were pointing to was simply that there was a disclosure that earnings were lower, Oracle says, no, no, no, no, you can't just say that the earnings went down. You have to link what was disclosed at that period to the false statement. You need the fraud. Pardon? You need the fraud. It has to be linked more than just to the earnings statement. Remember, in Gilead, what is disclosed isn't that now we know that there was a lie. Three months after  of, well, the FDA is going to have a big problem with how this drug is marketed, all that's learned is the effect on the company of the fraud. And that's what's happening here is that the market knows about the fraud as of June, that the white-lacing statements previously made by the company were not true, and you learn the consequences of it. You cannot just simply point to the fact that there was an earnings decline and that that is somehow in the abstract linked to some prior statement. It is a, it is a thin distinction, but it is the one that the court has drawn. And here, when you have the consequence of the fraud, the June fraud, is not fully understood by the marketplace, we don't know what has happened to the company, then that is a legitimate form of loss causation because it's the real world. That's just all that's happening here is there are times when things happen to a company, there's a fraud that's revealed, and the marketplace just doesn't know what it will mean for the company for a little while. Then you can still plead loss causation. Thank you, Your Honors. Thank you, Counsel. This case is submitted and we are adjourned
judges: McKEOWN, BYBEE, BUMATAY